## ATHEY *vs.* OLIVE.

[ACTION ON NOTE GIVEN FOR PURCHASE-MONEY OF SLAVE.]

1. *What constitutes breach of warranty of mental soundness.*—If a slave is neither insane, nor idiotic, nor subject to any mental derangement which interferes with the natural operations of the mind, the mere fact that he has less mental capacity than is usually found among slaves does not constitute a breach of warranty of sound mind.

2. *Right of rescission by purchaser.*—If a female slave is known to be with child at the time of her sale, an offer to rescind on the part of the purchaser, made after the birth and subsequent death of the child, cannot,be assumed to have been made too late, unless the purchaser had a reasonable time and opportunity, after the discovery of the facts which justify the rescission, to return the property before the death of the child.

APPEAL from the Circuit Court of Pike.

Tried before the Hon. JOHN GILL SHORTER.

THIS action was brought by Littleton Olive against Henry Athey, and was founded on the defendant's promissory note for $500, dated the 14th February, 1857, and payable on or before the 1st January, 1858, which was proved to have been given in part payment for the purchase-money of a slave. The defendant pleaded, "in short by consent, 1st, the general issue; 2d, failure of consideration; 3d, breach of warranty; and, 4th, fraud, deceit and misrepresentation in the sale of the slave."

On the trial, as appears from the bill of exceptions, after the plaintiff had read in evidence the note declared on, the defendant proved that said note was given in part payment for the purchase-money of a slave named Matilda, sold by plaintiff to him on the 14th February, 1857, at the price of $1,100; and read in evidence the plaintiff's bill of sale for the slave, which contained a warranty that the slave was "sound and healthy in body and mind." The defendant then introduced as a witness one Dr. Ponder, a physician, who testified, that he was acquainted with the slave Matilda; that said slave, while she was neither insane nor an idiot, wanted ordinary sense; that he at first attributed her want of ordinary capacity to her being in a state of parturition, but she continued to exhibit the same mental condition after her delivery; that said Matilda, if she had possessed ordinary capacity of mind, would have been worth in the market eleven or twelve hundred dollars; but, in her actual condition, was not worth more than five or six hundred dollars. Other witnesses testified, that said Matilda, at the time of the sale to defendant, was represented by plaintiff to be a good cook, washer and ironer, and seamstress; that she

came up to neither of these representations, (though the evidence on this point was conflicting,) and that she had been in plaintiff's family for some time previous to the sale to defendant. It was in evidence, also, that said Matilda was pregnant at the time of the sale, and was delivered of a child some three or four weeks afterwards; that the child lived only three or four weeks; that the defendant, prior to its death, had been heard to express himself satisfied with the trade, and to say that said Matilda was worth the money he gave for her; that he also stated, after the death of the child, that he would have been satisfied if the child had lived; and no complaint was shown to have been made by him until after the death of the child. One Clancey, a witness for plaintiff, testified, that said Matilda was a good cook, and did good washing; also, (on cross-examination,) that he was present at an interview between plaintiff and defendant in August or September following the sale, after the death of the child, when defendant offered to return said Matilda to plaintiff, and to rescind the sale,—stating that Matilda did not come up to plaintiff's warranty and representations respecting her; and that plaintiff declined to rescind the contract, and stated that it did not suit his circumstances at that time to rescind. Other witnesses testified, that Matilda had sufficient capacity to work cotton, and to do other farm work. It was further proved, that the parties lived in Pike county; that the defendant had bought Matilda for use in his family as a house servant, and had paid plaintiff six hundred dollars of the purchase-money. Plaintiff's witnesses testified as to the qualities of said Matilda, and that she was a good country cook, washer, &c. ; and one stated that she sewed well. Another witness for plaintiff testified, that Dr. Ponder (defendant's witness) had recommended the woman to him as a good house servant; that no offer to rescind, or proposition to that effect, was made until August or September after the sale, which was several months after the death of the child; that prior to the offer to rescind, the woman had worked on the defendant's farm during the summer after the death of the child, and had cooked

46

and washed for his family, during which time he had ample opportunity to ascertain her qualities and mental condition."

The court charged the jury as follows:

"1. That if they believed from the evidence that said Matilda was neither insane, nor an idiot, nor the subject of any mental derangement which interefered with the natural operations of the mind, but merely lacked ordinary sense, this was not such unsoundness as would constitute a breach of the warranty of soundness of mind contained in the bill of sale; and that if the defendant purchased the slave in February, and waited until August or September before offering to rescind the sale, it was too late, if he had the opportunity before that time to discover the defects on which he relied for a rescission, and did not act promptly after such discovery.

"2. That if the said slave was known to be with child at the time of the sale, and the child was born after the sale, and died before any offer to rescind was made, then, an offer to rescind, made after the death of the child, was too late."

To each of these charges the defendant excepted, and he now assigns them as error.

H. W. HILLIARD, for appellant.

R. W. WALKER, J.—Where a slave is neither insane, nor an idiot, nor the subject of any mental derangement which interferes with the natural operations of the mind, the mere fact that she lacks ordinary sense does not establish a breach of the warranty that she is of sound mind. Such a warranty is not a stipulation against mental weakness, or a guaranty that the slave is possessed of ordinary capacity. We will not say that the breach of such a warranty would not be made out by proving that the slave, though neither an idiot, nor insane, was of so low a grade of mental capacity as to disqualify her for the performance of the ordinary duties of slaves. We do not understand the charge given by the court below to assert that proposition. It was simply an instruction to the

jury, that a breach of the warranty did not result from the mere fact that the slave lacked ordinary sense—in other words, that she was possessed of less mental capacity than is commonly found among slaves. Thus considered, it was free from error. A slave may possess less than the average capacity of that class of persons, and yet not be disqualified from discharging the ordinary duties imposed upon them.—Belew v. Clark, 4 Humph. 506; Farnsworth v. Earnest, 7 Humph. 24; Sloan v. Williford, 3 Ired. 307; Simpson v. McKay, 12 Ired. 141.

The court erred, however, in charging the jury that, if the woman was known to be with child at the time of sale, and the child was born after the sale, and before any offer to rescind was made, then, an offer to rescind, made after the death of the child, was too late. The charge seems to assume, that the birth of the child and its subsequent death would deprive the purchaser of his right to rescind, although the facts which would justify the rescission might not be discovered until afterwards. The error of such a view is manifest upon the mere statement of it. All that the law requires of a purchaser, who insists upon a rescission, is that he shall act promptly upon the discovery of the fraud, and return, or offer to return the property, within a reasonable time.—Dill v. Camp, 22 Ala. 249. If the defendant did not discover the alleged fraud until after the death of the child; or if, though he discovered it before that event, the period intervening between such discovery and death was so short, as not to afford him a reasonable opportunity of returning the property before the death of the child, it is plain that it ought not to be held that he was thereby deprived of his right to claim a rescission.

Judgment reversed, and cause remanded.